Teofil Novak, appellee. v. Omaha & Lincoln Railway & Light Company, appellant.

Filed February 1, 1919.    No. 20337.

**Street Railways:** Operation: Actionable Negligence. It is the duty of the motorman of an interurban car, who sees a frightened team upon the highway close to the track in ample time to prevent damage, to slow down his car so as to bring it either to a stop, or under control as he approaches the team, and if he fails to take such precaution, and as a consequence damages result, his failure will constitute actionable negligence.

Appeal from the district court for Douglas county: Lee S. Estelle, Judge. *Affirmed on condition.*

*Brome & Brome* and *Joseph P. Uvick,* for appellant.

*Jamieson & O'Sullivan,* contra.

ALDRICH, J.

The jury in this case have found upon conflicting testimony, and being the triers of fact, that they not only had the right to do this, but it was their duty to determine what was the truth after all testimony had been submitted, and on their conscience and judgment, and the instructions of the court, determine as to which party should prevail; "and this finding of fact, unless clearly wrong," will not be disturbed, because the jury in the realm of fact is absolute so long as it finds consistently with truth and justice: and their finding in this case, as to whose carelessness and negligence is responsible for the injury complained of, in our judgment, is correct.

It is admitted that the car was going east, and the plaintiff and his team were going west, and the team, upon seeing the car, became frightened and unmanageable. This occurred when the car was at least one block or more (that being 300 feet or more) away from the team. Then it devolved upon the motorman to stop his car, or to bring its speed under absolute control so that said car could be brought to a standstill within 25 or 30 feet; but, instead of doing this as a prudent and cautious man would naturally do, he proceeded to let the car run, and never at any time during the whole trouble did he stop it at all, but only slightly slackened its speed. The motorman then having seen the car when a block away, and being on a level track could absolutely have stopped the car and prevented this accident but instead he chose to keep on moving and at considerable speed and by so doing ran down and injured the plaintiff herein. This situation, the record discloses, is obvious, and not in any way contradicted. The motorman, and a companion, a disinterested witness, and all parties, so far as that is concerned, admit the car was not stopped at all, and it is agreed that it could have been stopped to a dead standstill, and have avoided the accident. The motor-

man, it appears, is responsible for this accident, and the injury resulting therefrom. The only question for us to determine is: To what extent were these injuries inflicted, and is the judgment reasonable and just? This question presents some difficulty.

The question we are deciding herein, after finding appellant liable, is: Was the verdict excessive, and does the evidence sustain the amount of recovery found by the jury? To this proposition we answer: There is no sufficient and competent evidence to sustain a verdict of $4,000. The evidence does not clearly show any permanent injury. The attending physician says a callous had formed on the hip joint, but an X-ray examination disclosed no such callous, nor any permanent injury. The man making this X-ray examination qualified as an expert, says that, had such injury been permanent, it would be ascertained, and that the examination disclosed no permanent injury. On this statement, and other evidence, it seems clear that the verdict is excessive. After the examination of the record and the testimony, we conclude the verdict excessive, and find that the amount entitled to be recovered by the plaintiff herein is $1,500. Unless the plaintiff files his remittitur in the sum of $2,500 within 20 days, then the judgment is reversed and the cause remanded for a new trial.

AFFIRMED ON CONDITION.

SEDGWICK, J., dissenting.

The plaintiff, while driving west alongside of the street car tracks, had some trouble with his horses. At this time the car was approaching from the west at a distance of several hundred feet, and the plaintiff contends that the noise of this approaching car frightened his horses. The defendant concedes that, when the plaintiff and his horses were first observed by the motorman, the car was running at a speed of from 20 to 30 miles an hour. The plaintiff testified that it was going from 35 to 40 miles an hour. The plaintiff also

testified that the car did not slacken its speed until the accident complained of occurred. Plaintiff's witness Grabowski also so testified. These two witnesses testified through an interpreter, and either because of this fact, or because they were reckless, their testimony seems peculiar and possibly in some respects inconsistent. The defendant's witness Westover, who was riding with the motorman, testified that, before the plaintiff was observed by the motorman, the car was moving at not to exceed 25 to 30 miles an hour, and that the speed was reduced when about two blocks from the team, and that, when the car came in contact with the cultivator, it was moving 10 or 12 miles an hour. The motorman testified to the same condition. Critchfield, a passenger on the car, testified that, when the car was about 600 feet from the accident, it was going about 15 miles an hour, and when the car was 2 or 3 rods from the team it seemed to rather suddenly stop, and that then "the team turned around a little bit to the south, looking away from the car; and then he (plaintiff) kind of slapped them a little with the line, I thought, and then, when the motorman started the car up a little bit—it was slowed up a little, and then he started up like they were going off; I supposed everything was all right again, and they started on. They made up until they came about even, and then the team backed up, and started backing up, and they backed clear down into the car. Q. How far was the cultivator, the rear end of the cultivator, from the track when the horses were turned to the south, and before they started to back? A. They were back in the middle of the road; I should think it would be 15 feet, probably;" and that when the collision took place the speed of the car was from 5 to 8 miles an hour. Walker, another witness, testified that, when the car passed him about 500 feet from the place of the accident, it was going "from 10 to 12 miles, somewhere along in there." The car conductor testified that at the

time of the collision the car was going from 8 to 10 miles an hour. The speed of the car when it was 1,000 or more feet from the place of the accident could not be the proximate cause of the injury, and there is very little contention in the briefs upon that point. The theory of the defendant, which seems to be fairly well supported by the evidence, is that, when the motorman first saw this team so near the track, he immediately reduced the speed of the car to 8 or 10 miles an hour, and, as he approached the plaintiff, the team had crossed the track and was standing quietly with the cultivator between them and the track some 10 or 15 feet from the track; that there was then no appearance of danger to the plaintiff or his team; and, as the car was passing them, they suddenly backed the cultivator against the side of the car. This was the substance of the defense, and it was contended that the evidence entirely failed to show that the conditions were such as to make it reasonably appear necessary to stop the car entirely, in order to avoid injuring the plaintiff. This defense and some questions of errors occurring at the trial and in the instructions are the matters discussed in the defendant's brief, but they are not mentioned in the majority opinion.

I cannot concur in this disposition of the case.